IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ERIC THORNTON,                    )
                                  )
        Plaintiff,                )        NO. 3:20-cv-00159
                                  )
v.                                )        JUDGE RICHARDSON
                                  )
DUTCH   NATURALS   PROCESSING,    )
LLC, and SHAWN RIDLEY,            )
                                  )
        Defendants.               )

## <u>MEMORANDUM OPINION</u>

Pending before the Court are four motions for summary judgment: Plaintiff's Motion for Summary Judgment on Breach of Contract Claim (Doc. No. 140); Plaintiff's Motion for Summary Judgment on his Veil Piercing Claim as to Individual Defendant Shawn Ridley (Doc. No. 137); Defendant Dutch Naturals Processing, LLC's Motion for Summary Judgment (Doc. No. 134); and Defendant Shawn Ridley's Motion for Summary Judgment (Doc. No. 135). Defendants and Plaintiff have filed respective responses and replies to each pending summary judgment motion. For the reasons stated below, Plaintiff's motions (Doc. Nos. 137 and 140) will be GRANTED, and Defendants' motions (Doc. Nos. 134 and 135) will be DENIED.

FACTS[1]

This lawsuit involves a dispute over the sale of hemp.[2] On November 22, 2019, Plaintiff Eric Thornton and Defendant Dutch Naturals Processing, LLC ("DNP") signed a Bill of Sale for the purchase and sale of fifty-percent of hemp biomass ("the hemp"). A copy of the Bill of Sale is provided below:

---

[1] Unless otherwise noted, the facts and contentions referred to in this section are taken from the language of the Bill of Sale (Doc. No. 1-1); Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 152-5) and Defendant's Response to Plaintiff's Statement of Undisputed Material Facts. (Doc. No. 148). Facts that are stated herein without qualification are undisputed and treated as such.

[2] In the Bill of Sale, "the hemp" is defined as "all of SELLER's undivided FIFTY-PERCENT (50.00%) property interest in industrial hemp biomass including without limitation all industrial hemp floral material normally contained therein ("the PRODUCT"), currently owned jointly and equally by ERIC THORNTON ("SELLER") and WILLIAM SPANN ("SPANN") located at 3301 Highway 70, Burns, Tennessee, in Dickson County, Tennessee, excluding all smokable hemp at or located at 702 East College Street, Dickson, Dickson County, Tennessee, to be harvested as 2019 crop." (Doc. No. 1-1).

## INDUSTRIAL HEMP PRODUCT BILL OF SALE

THIS BILL OF SALE ("Bill of Sale") is made and entered into as of the ____ day of November, 2019, by and between **ERIC THORNTON** ("SELLER") and **DUTCH NATURALS PROCESSING, LLC** ("PURCHASER").

FOR AND IN the consideration of the sum of FOUR HUNDRED THOUSAND AND 00/100 DOLLARS ($400,000.00), to be paid as hereinafter set forth, and subject to the conditions set forth herein, **SELLER** hereby unconditionally and absolutely transfers, conveys and sets over to **PURCHASER**, without warranty or representation of any kind, express or implied, except as set forth herein, all of SELLER'S undivided **FIFTY-PERCENT (50.00%)** property interest in industrial hemp biomass including without limitation all industrial hemp floral material normally contained therein **(the "PRODUCT")**, currently owned jointly and equally by **ERIC THORNTON** ("SELLER") and **WILLIAM SPANN** ("SPANN") located at 3301 Highway 70, Burns, Tennessee, in Dickson County, Tennessee, excluding all smokable hemp at or located at 702 East College Street, Dickson, Dickson County, Tennessee, to be harvested as 2019 crop. This bill of sale is between **PURCHASER** and **SELLER** but is with acceptance and consent of **SPANN** (SPANN AND SELLER are jointly referred to hereafter collectively as "SPANN and THORNTON") and applies specifically to the **PRODUCT** to be harvested from acreage licensed by the Tennessee Department of Agriculture to **SELLER** and grown in accordance with such license by **SPANN** and **THORNTON** for the 2019 crop year. The **PRODUCT** is to be delivered as set out below.

SELLER warrants and represents that the **PRODUCT** in which the 50% interest is being purchased hereby will meet at the time of delivery and at the time of purchase, the following specifications, terms and conditions as set forth herein:

1. The **PRODUCT** has been or will be delivered to one of **PURCHASER's** affiliate's locations, at **PURCHASER'S** instructions, located at 1253 Petty Road, White Bluff, TN, 37187 or to 901 Floyd Street, Leitchfield, KY 42755 stripped and contained in super sacks or seed bags with handling loops, or in gaylords. **SPANN**, or his appointed representative, shall have complete oversight authority and management of all logistics regarding inspection, acceptance, rejection, shipping and containment of **PRODUCT**. **SPANN's**, or if he uses an appointed representative, then the appointed representative's decision and direction shall be final and binding on **PURCHASER** and **SELLER**.

2. A true, complete and fully accurate copy of the current state license to grow Industrial Hemp in 2019 which applies to the **PRODUCT** is attached hereto as Exhibit "A".

3. **PURCHASER** shall pay to SELLER the sum of FOUR HUNDRED THOUSAND AND 00/100 DOLLARS ($400,000.00), as follows: (a) the sum of TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00) (the "INTIAL PAYMENT") within thirty (30) days from the execution and delivery of this Bill of Sale, and (b) the balance of ONE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($150,000.00) to be paid within seventy-five (75) days from the execution and delivery of this Bill of Sale.

4. **PURCHASER** shall have all control and commercial use of **PRODUCT** prior to **INITIAL PAYMENT**, but not before execution of this **BILL OF SALE**.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE. THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]



Agreed upon:

_____     $11/22/19$
ERIC THORNTON (**SELLER**)                DATE

DUTCH NATURALS PROCESSING, LLC, a Kentucky
limited liability company, PURCHASER

BY: _____     $11/22/19$
    SHAWN RIDLEY, CEO                    DATE

Accepted and approved as to matter pertaining to the undersigned:

_____     $11/22/19$
WILLIAM SPANN ("SPANN")                DATE

As noted, the Bill of Sale indicates that Plaintiff would sell DNP the hemp for a total purchase price of $400,000. DNP was to pay the purchase price in two installments. The first payment of $250,000 was due within 30 days of the contract signing, and the second payment of $150,000 was due within 75 days of signing. The Bill of Sale also stated that William Spann or his appointed representative would "have complete oversight authority and management of all logistics regarding [i]nspection, acceptance, rejection, shipping and containment." (Doc. No. 1-1).

Plaintiff delivered the hemp per DNP's instructions to 1253 Petty Road, White Bluff, Tennessee. (Doc. No. 154-4 at ¶ 10). DNP sent samples of the hemp to CannaBusiness Labs for its quality to be tested. (Doc. No. 152-5 at ¶ 15). DNP received the results of this testing and declined to proceed with the purchase of the hemp. (Doc. No. 152-5 at ¶¶ 19-21). On January 24, 2020, DNP did not make any payment to DNP as contractually required. (Doc. No. 148 at ¶ 11, Doc. No. 152-5 at ¶¶ 21, 22). That same day, Plaintiff filed this lawsuit in state court, asserting a breach-of-contract claim (Count I), a claim to pierce the corporate veil so as to hold Ridley

responsible (Count II);[3] and a promissory-estoppel claim (Count III). The lawsuit was later removed to this Court based on diversity jurisdiction.[4]

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a

---

[3] Although styled by Plaintiff as an independent claim, veil-piercing actually "is best thought of as a remedy to enforce a substantive right, and not as an independent cause of action." *Tamko Roofing Prod., Inc. v. Smith Eng'g Co.*, 450 F.3d 822, 826 n.2 (8th Cir. 2006) (citing *Grothues v. Internal Revenue Serv.*, 226 F.3d 334, 337–38 (5th Cir.2000)). For ease of discussion, however, the Court will refer to Plaintiff's veil-piercing theory as a "claim" rather than a request for a particular remedy (holding Ridley liable) to enforce a substantive right (to recover for DNP's alleged breach of contract).

[4] According to the Notice of Removal (Doc. No. 1), Plaintiff is a Tennessee resident, while Defendant Ridley is a Kentucky resident and DNP is a Kentucky limited liability whose sole member is a Delaware limited liability company (Dutch Naturals, LLC), whose sole member is Defendant Ridley. According to recent filings with the Kentucky Secretary of State, the sole member, https://web.sos.ky.gov/corpscans/05/1079405-06-99999-20220308-ARP-8717070-PU.pdf and sole manager, https://web.sos.ky.gov/corpscans/05/1079405-06-99999-20210420-ARP-8344231-PU.pdf, of Dutch Naturals, LLC is Ridley.

Significantly, according to its articles of organization, DNP is managed "by one or more managers" (not necessarily a member-manager), https://web.sos.ky.gov/corpscans/57/1074457-06-99999-20191014-KLC-7744217-PU.pdf, and Ridley is the sole manager of DNP. *See Dutch Naturals Processing, LLC*, Kentucky Secretary of State, https://web.sos.ky.gov/ftshow/(S(co13i4gbysxu5yceiomiffdk))/default.aspx?path=ftsearch&id=1074457&ct=06&cs=99999&ce=Tpy%2buMN0NAXeYCAR1eQAlmxxeofH7GOeMeUBbdEPQuzJSsv%2fZwqdtoHChOVT6j2p.

verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). Accordingly, courts (appropriately) at times refer interchangeably to (i) a non-movant showing the existence of a genuine issue as to a (material) fact and (ii) a reasonable jury being able to find in the non-movant's favor as to that fact, and this Court does likewise. "[C]ourts draw all reasonable inferences and view the evidence in the light most favorable to the [nonmovant] to determine whether there is a genuine dispute of material fact. That means that, in most cases, evidence offered by the nonmovant must be accepted as true and that credibility judgments and weighing of the evidence are improper." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (internal quotation marks and citation omitted).

It is typically stated that the party bringing the summary judgment motion (the movant) has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *See, e.g. Johnson v. Ford Motor Co*., 13 F.4th 493, 502 (6th Cir. 2021) ("At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." (quoting *White v. Baxter Healthcare Corp*., 533 F.3d 381, 389–90 (6th Cir. 2008))); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). But this is somewhat inexact in the aftermath of 2010 amendments to Rule 56. The movant's initial burden actually is to demonstrate the absence of a genuine issue of material fact, and not necessarily to so demonstrate specifically by referencing portions of the record. True, prior to the 2010 amendments, referencing portions of the record seemed to be the only way to make such a demonstration, and even today that is the primary way to make such a demonstration.[5] But the 2010 amendments added, *inter alia* Rule

---

[5] Under current Rule 56, a party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—still can (and typically does) attempt to support the

56(c)(1)(B), which "recognizes that a party need not always point to specific record materials." Rule 56 2010 Amendment Advisory Committee Note.

Under Rule 56(c)(1)(B), the movant actually has another available means—an alternative to *citing materials in the record*—for demonstrating the absence of a genuine issue of material fact. Specifically, the moving party may meet its initial burden (to indicate the absence of a genuine issue of material fact) by "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support [a material] fact" (for example, the existence of an element of a nonmovant plaintiff's claim). *See* Fed. R. Civ. P. 56(c)(1)(B).[6]

If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 689 (M.D. Tenn. 2019) (citing *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240,

---

assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. *See* Fed. R. Civ. P. 56(c)(1)(A).

[6] More specifically, Rule 56(c)(1)(B), as added in 2010, provides in pertinent part that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). This means, specifically in the case of a party asserting that a fact *cannot be* genuinely disputed (which typically would be the summary judgment *movant*), that its assertion can be supported by "show[ing]"—even without citing materials of record—that the adverse party (typically the *non-movant*) cannot produce admissible evidence to support the fact.

248 (6th Cir. 1991)). On the other hand, it is important to keep in mind a principle applicable in the event of cross-motions (but not implicated by the typical situation where only one or more defendants, and not any plaintiff, has moved for summary judgment): "[I]f the moving party will bear the burden of persuasion at trial [as does a plaintiff as to its case-in-chief], then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322-23); *see also Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (explaining that if the moving party bears the burden of proof at trial that party "must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact— and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial." (citing William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477–78 (1992))).[7] That is to say, to prevail on its case in chief, the plaintiff must show that no reasonable jury could not find in its favor on its case in chief.

One important implication from the prior paragraph is that the court should not, in determining whether one side or the other is entitled to summary judgment on a particular claim, take the approach of looking at all relevant evidence from a single perspective and then ask whether the evidence reflects a genuine issue of material fact such that neither party is entitled to summary judgment. Instead, the court must consider the cross-motions separately, viewing the evidence not from a single perspective, but rather from one perspective on one cross-motion and then from a

---

[7] Notably, "judgment as a matter of law" (pursuant to Fed. R. Civ. P. 50(a)) is the newer term for "directed verdict" and is awardable essentially on the same basis as was a directed verdict historically; Rule 50(a) reflects the "no reasonable jury could find against the party" standard, to which the Court refers above, that traditionally historically has been the standard for a directed verdict.

different perspective on the other cross-motion; more specifically, the court must view the evidence in favor of the non-movant on each of the respective cross-motions, and ask whether the movant has shown the absence of a genuine issue of material fact even with the evidence viewed in the non-movant's favor.

## ANALYSIS

### I. Breach-of-Contract Claim

"Under Tennessee law, the elements for a breach-of-contract claim are: (1) the existence of an enforceable contract; (2) nonperformance amounting to breach of the contract; and (3) damages caused by the breach of contract."[8] *W. Silver Recycling, Inc. v. ProTrade Steel Co., LTD.*, 476 F. Supp. 3d 667, 676 (M.D. Tenn. 2020) (Richardson, J.) (citing *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). The elements of a breach-of-contract claim are not altered by the UCC.[9] *Id.* (citing *Orlowski v. Bates*, 146 F. Supp. 3d 908, 923 (W.D. Tenn. 2015) (citing the elements of a common law contract claim when analyzing a breach-of-contract claim involving the sale of goods)). The UCC prescribes that "[t]he obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." Tenn. Code Ann. § 47-2-301. "Thus, the failure of either party to satisfy this obligation constitutes a nonperformance amounting to a breach of contract." *W. Silver Recycling, Inc.*, 476 F. Supp. 3d at 676.

---

[8] The parties agree that Tennessee law applies to Plaintiff's breach-of-contract claim.

[9] Here, the UCC applies because the dispute is over the sale of hemp, and "growing crops" is mentioned in the definition of goods in the UCC. Tenn. Code Ann. § 47-2-105(1). *See First Tenn. Prod. Credit Assoc. v. Gold Kist Inc.*, 653 S.W.2d 418, 419 (Tenn. Ct. App. 1983) (applying UCC principles to sale of soybean crop); *Mammoth Cave Prod. Credit Assoc. v. Oldham*, 569 S.W.2d 833 (Tenn. Ct. App. 1977) (applying UCC principles in a conversion case involving secured tobacco crops).

As noted above, pending before the Court are cross-motions for summary judgment, wherein each party contends in his (or its) respective motion that he (or it) is entitled to judgment on Plaintiff's breach-of-contract claim. Accordingly, the Court must apply the well-recognized summary judgment standards when deciding each cross-motion; that is, consistent with the discussion above, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

The Court first will address Plaintiff's motion regarding the breach-of-contract claim, and in so doing will view inferences in the light most favorable to DNP.

*Plaintiff's Motion*

Plaintiff's theory is based on the fact that the Bill of Sale provides that the hemp is being sold "without warranty or representation of any kind, express or implied, except as set forth herein." (Doc. No. 1-1). Plaintiff asserts that "[a]s a result [of this language], DNP had no right to reject the goods on the ground that they were nonconforming." (Doc. No. 152 at 5). According to Plaintiff, DNP therefore breached the contract when it rejected the hemp and refused to pay the purchase price under the Bill of Sale. (*Id.*). Thus, Plaintiff argues that the undisputed facts reveal that DNP breached the contract and that therefore Plaintiff is entitled to summary judgment on his breach of contract claim.

DNP concedes that "[t]he Bill of Sale disclaims any warranty or representation of any kind, express or implied." (Doc. No. 153 at 1). DNP further concedes that this disclaimer renders unviable their counterclaim for breach of contract, but they dispute that the disclaimer vitiated DNP's right to reject the hemp. As DNP explains its position:

> [Defendants] recently filed a voluntary dismissal of its counterclaim with the consent of the Plaintiff. The Court dismissed the counterclaim. *See* Documents no.

144 and 145. The rationale was simple. The Bill of Sale disclaims any warranty or representation of any kind, express or implied. It therefore was legally inconsistent with the terms of the Bill of Sale to maintain a counterclaim for the losses DNP sustained by reason of issues with the hemp leading to rejection. Thus, the Rule 41 (a) voluntary dismissal was filed as to the counterclaim by agreement of the parties. The Court dismissed the counterclaim as requested but under Rule 21. That dismissal of the counterclaim does not mean that there was no right to reject the hemp. . . . If all the words in the Bill of Sale are to have meaning, then the right to accept or reject as well as inspect existed but that there is no damages remedy for any loss to DNP sustained by reason of the rejection. DNP's sole remedy was not to pay the purchase price if the hemp was rejected. The lack of any warranty does not mean there is no right of acceptance, rejection or inspection. This construction is the one the Court should use in construing the words of the Bill of Sale. It gives meaning to each word of the warranty section and the acceptance-rejection-inspection section of the Bill of Sale.

(*Id.*). As explained below, the Court disagrees with DNP.

### A. The Disclaimer Language is Unambiguous and Therefore May Be Interpreted at the Summary-Judgment Stage.

"Th[e] Court's initial task in construing a contract is to determine whether the language is ambiguous." *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc*., 78 S.W.3d 885, 890 (Tenn. 2002).. "Contractual language 'is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611–12 (Tenn. 2006) (quoting *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975)). "Where the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and the courts must resort to other rules of construction." *Planters Gin Co.*, 78 S.W.3d at 890. However, if the language is clear and unambiguous, the literal meaning controls the outcome of the dispute. *Id*. When a contract is unambiguous, its interpretation is a question of law that is appropriate for summary judgment. *Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012) ("Questions of contract interpretation are generally considered to be questions of law, and thus are especially well-suited for resolution by summary judgment.") (citing *Ross Prods. Div. Abbott Labs. v. State*, No. M2006–

01113–COA–R3–CV, 2007 WL 4322016, at *2 (Tenn. Ct. App. Dec. 5, 2007), perm. app. denied (Tenn. Apr. 28, 2008)).

Parts of some judicial opinions speak as if the court's initial task in contract construction is to determine whether a *particular provision* in the contract is ambiguous. *Planters Gin Co.*, 78 S.W.3d at 890 ("[A] contractual provision may be susceptible to more than one reasonable interpretation, which renders the terms of the contract ambiguous."). But this is inexact. Properly understood, contractual interpretation is not about interpreting particular contractual provisions in isolation, but rather about construing the contract *as a whole*. "The proper construction of a contractual document is not dependent on . . . any single provision of it, but upon the entire body of the contract and the legal effect of it as a whole. The whole contract must be considered in determining the meaning of any or all of its parts." *Aetna Cas. & Surety Co. v. Woods,* 565 S.W.2d 861, 864 (Tenn. 1978) (citation omitted). Of course, the "meaning" of the contract to be determined is its meaning with respect to the particular issue confronting the Court, and it is important for the court to understand and articulate that issue when undertaking contract construction. In the instant case, the issue is identified below (as the "right-to-reject issue").

According to Tennessee law, whether contractual language is ambiguous is a question of law to be decided by the court. *Burka v. Vanderbilt Univ. Med. Ctr.*, 550 F. Supp. 3d 530, 541 (M.D. Tenn. 2021) (citing *Stonebridge Life Ins. Co. v. Horne*, No. W2012-00515-COA-R3-CV, 2012 WL 5870386, at *4–*5 (Tenn. Ct. App. Nov. 21, 2012)). The Court realizes that the concept of ambiguity can be subjective, in that there is a continuum between what can be called "ambiguous" and what can be called "unambiguous," and in many cases there can be reasonable disagreement about where on the continuum the possibly ambiguous item (such as, in this case, a contract term) falls. That is why, for example, in *Planters Gin Co.*, the learned jurists on the

Tennessee Supreme Court came to the opposite conclusion regarding ambiguity than had the learned jurists of the Tennessee Court of Appeals. All of which is to say that sometimes ambiguity is in the eye of the beholder. Be that as it may, it is the Court's job to call it like it sees it, giving a yes/no answer to the question of whether the contact is ambiguous. The Court must call the contract unambiguous on the issue in question if it concludes that the meaning of the primary provision bearing on that issue is "inescapable," especially when considered in conjunction with any secondarily applicable provisions. *See Planters Gin Co.*, 78 S.W.3d at 891 ("We, however, find no ambiguity in the contract at bar. . . . The meaning of [the primarily applicable] provision is inescapable, particularly given the language [that follows it].").

Is the Bill of Sale ambiguous with respect to what the Court herein will call the "right-to-reject issue," *i.e.*, whether, under the Bill of Sale, DNP disclaimed the right to reject the goods as non-conforming? That is the question the Court must answer. To do so, the Court naturally must identify the particular contract language that is applicable to the issue in question. *Id.* at 890 (starting the analysis of ambiguousness by identifying the particular "language at issue" in the contract).

There are two contractual terms that bear on the right-to-reject issue: i) the provision that Plaintiff sells the hemp to DNP "without warranty or representation of any kind, express or implied, except as set forth herein" ("warranty-disclaimer provision"); and ii) the provision that "Spann, or his appointed representative, shall have complete oversight authority and management of all logistics regarding inspection, acceptance, rejection, shipping, and containment of PRODUCT" ("rejection-logistics provision")[10] (Doc. No. 1-1). No party asserts that these terms, whether considered individually or together, are ambiguous as to the right-to-reject issue. In fact,

---

[10] Plaintiff calls this the "acceptance-rejection-inspection" provision. (Doc. No. 153 at 2).

both DNP and Plaintiff ask the Court to interpret the contract at the summary judgment stage, thereby impliedly acknowledging that the Bill of Sale is unambiguous. Nevertheless, the Court must determine for itself whether the contractual language on this issue is ambiguous, and to do so the Court must first interpret the Bill of Sale to determine whether the right-to-reject issue "may fairly be understood in more ways than one." *Watson*, 195 S.W.3d at 611–12.

It is well settled that the language used in a contract must be taken and understood in its plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc*., 521 S.W.2d 578 (Tenn. 1975). In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. *Ballard v. North American Life & Casualty Co*., 667 S.W.2d 79 (Tenn. Ct. App. 1983). Provisions in a contract "should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano v. Cleo, Inc*., 995 S.W.2d 88, 95 (Tenn. 1999).

Under Tennessee law, "implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." Tenn. Code Ann. § 47-2-316 3(a).[11] A complaint for nonconforming goods is, by definition, a claim to recover damages for breach of warranty. *Moore v. Howard Pontiac-Am., Inc*., 492 S.W.2d 227, 229 (Tenn. Ct. App. 1972). Rejection of goods as nonconforming is a warranty-based remedy. *Id*. In other words, a buyer may be able to reject goods if his seller has represented to him that they are of *x* or *y* character and, upon delivery, they are not of that character. But if the contract contains no warranties, the buyer has no basis to, and therefore cannot, reject the goods as non-conforming. *See id*. at 229-30.

---

[11] That does not necessarily apply to all implied warranties—like the warranty of merchantability. Nevertheless, DNP does not make this argument and the Court will therefore not go there.

The Court will first look to the warranty-disclaimer provision of the Bill of Sale, which provides that DNP is buying the hemp "without warranty or representation of any kind, express or implied, except as set forth herein." (Doc. No. 1-1). The Court finds that this language simply cannot be interpreted in more ways than one. As a result, it is clear from the Bill of Sale that DNP had no right to reject the goods on the basis that DNP found the goods to be nonconforming. DNP admits this when it asserts that they dismissed their counterclaim for breach of contract because the "Bill of Sale disclaims any warranty or representation of any kind, express or implied," and therefore it "was legally inconsistent with the terms of the Bill of Sale to maintain a counterclaim for the losses DNP sustained by reason of issues with the hemp leading to rejection." (Doc. No. 153 at 1).

Additional language in the Bill of Sale does not alter this result. DNP asserts that it nevertheless has a viable defense because (according to DNP) "the lack of any warranty does not mean that there is no right of acceptance, rejection, or inspection." (*Id*. at 2). DNP argues that the right to reject the hemp exists by virtue of the rejection-logistics provision (which is the only other language in the contract even relevant to the right-to-reject issue). (*Id*.). Based on the rejection-logistics provision—which, it bears repeating, states that "Spann, or his appointed representative, shall have complete oversight authority and management of all logistics regarding inspection, acceptance, rejection, shipping, and containment of PRODUCT"—DNP asserts that "if all the words in the Bill of Sale are to have meaning, then the right to accept or reject as well as inspect existed[.]" (*Id*. ).

However, as explained above, provisions in a contract "should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano*, 995 S.W.2d at 95. Construing the rejection-logistics

provision in harmony with the warranty-disclaimer provision, the Court finds that the rejection-logistics provision in the Bill of Sale was referring to a right to reject a shipment—proffered by Plaintiff in purported satisfaction of his obligations under the Bill of Sale—for any reason (such as the kinds of reasons indicated below) *other than quality-based issues with the hemp*. This reading enables it to be reconciled with the warranty-disclaimer provision, while reading it as DNP suggests would render the warranty-disclaimer provision a nullity, and such a reading is not favored under the law. *See In re Pyramid Operating Auth., Inc*., 144 B.R. 795, 814 (Bankr. W.D. Tenn. 1992) ("It is a fundamental rule of contract construction that the entire contract, and each and all of its parts and provisions, including the signatures, must be given meaning, and force and effect, if that can consistently and reasonably be done. An interpretation which gives reasonable meaning to all of its provisions will be preferred to one which leaves a portion of the writing useless, meaningless, or inexplicable.").

Thus, the Court does not disagree with DNP that the Bill of Sale gave DNP the right to reject the shipment but does disagree with DNP that the Bill of Sale gave DNP the right to reject the shipment of hemp on the basis of quality-related issues. And a buyer's rejection of goods can be based on something other than being non-conforming. For example, a buyer can reject a shipment that was received too late, included a lesser quantity of product than was called for by the contract, or delivered to a location other than the location that was agreed upon by the buyer and seller—or, more fundamentally, was simply not the kind of product called for in the contract. Here, for example, it would be entirely consistent for the second provision to be read as acknowledging that DNP could reject a shipment from Plaintiff on these kinds of grounds—that the quantity shipped was less than called for by the Bill of Sale, that the shipment was too late, or that what was shipped was not actually hemp, for example—while reading the first provision as

disclaiming any warranty as to the quality of any hemp that was delivered in purported satisfaction of Plaintiff's obligations under the Bill of Sale. Tennessee law favors "allowing competent parties to strike their own bargains." *Ellis v. Pauline S. Sprouse Residuary Tr.*, 280 S.W.3d 806, 814 (Tenn. 2009). Courts are not concerned with the wisdom or folly of voluntary agreements. *Chapman Drug Co. v. Chapman*, 341 S.W.2d 392, 398 (Tenn. 1960). The Court's "role is to enforce an unambiguous contract as it is written unless the contract is being challenged based on fraud or mistake." *Boyd v. Comdata Network*, Inc., 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002).

Therefore, the Court finds that the contractual language at issue is not ambiguous as to whether DNP disclaimed the right to reject the hemp as non-conforming. The warranty-disclaimer provision is clearly laid out and simply cannot be understood in more ways than one, even when considered in conjunction with the second provision. *See Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, No. 3:08-0368, 2009 WL 2983035, at *7 (M.D. Tenn. Sept. 14, 2009) (holding that the language "Except for the written warranty state above, there are no other warranties, expressed or implied . . . Provost hereby disclaims any and all such warranties" unambiguously waived "every implied warranty, without exception"). Moreover, the language providing Spann with oversight authority of all logistics regarding inspection, acceptance, rejection, etc., does not make the Bill of Sale ambiguous with respect to the right-to-reject issue—and to find otherwise would result in a reading of the Bill of Sale that would fail to give effect to each of two provisions that can, as discussed above, easily be reconciled; instead, it would require a strained reading of the contractual language, and "[a] strained construction may not be placed on the language used to find ambiguity where none exists." *Morsey Constructors LLC v. JMN Rebar LLC*, 448 F. Supp. 3d 812, 816–17 (M.D. Tenn. 2020) (citation omitted). Further, although the parties have different interpretations of the contractual language, "[a] contract is not ambiguous merely because the parties have

different interpretations of the contract's various provisions." *Fisher v. Revell*, 343 S.W.3d 776, 779 (Tenn. Ct. App. 2009) (internal citations omitted); *see also Crye-Leike, Inc. v. Carve*r, 415 S.W.3d 808, 816 (Tenn. Ct. App. 2011) ("Ambiguity . . . does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. A contract is ambiguous only when it is of uncertain meaning."). The Court may not "create an ambiguity where none exists in the contract," *id*., and the language at issue—even when viewed collectively and not with an exclusive focus on the first provision—is unambiguous.

Accordingly, because the Court finds that the Bill of Sale unambiguously disclaims DNP's right to reject the hemp as non-conforming, the Court may interpret the Bill of Sale (based on its unambiguous language on the right-to-reject issue) as a matter of law at the summary-judgment stage. *See Bourland, Heflin, Alvarez, Minor & Matthews, PLC* , 393 S.W.3d at 674 (explaining that when a contract is unambiguous, its interpretation is a question of law that is appropriate for summary judgment). And the Court's interpretation of the Bill of Sale is that DNP disclaimed the right to reject the goods as non-conforming.

## B. Plaintiff Did Not Breach the Agreement First.

DNP argues that even if the Bill of Sale did not allow DNP to reject the hemp as nonconforming, DNP's failure to pay under the Bill of Sale is excused because (according to Defendant) Plaintiff breached the agreement first by demanding payment before it was due. (Doc. No. 134-1 at 22-23). According to DNP, Plaintiff "attempt[ed] to force waiver of the right of inspection and acceptance or rejection [b]y repeatedly making demands for payment of the first installment before it was due and threatening suit . . . [thereby failing to] comport[] with the standards of good faith and fair dealing applicable to contract." (*Id*. at 22). DNP does not assert that any specific term of the Bill of Sale was breached by Plaintiff; rather, as just indicated, DNP

relies on an alleged breach of what is known as the covenant of good faith and fair dealing. In response, Plaintiff asserts that DNP's argument "is a manufactured argument predicated entirely on the implied covenant of good faith and fair dealing, which is only applicable as part of an affirmative claim for breach of contract claim (which [DNP does] not bring)." (Doc. No. 152 at 3).

Even assuming the facts DNP relies on to support its argument are undisputed, the covenant of good faith and fair dealing is simply not applicable here. Consistent with DNP's implication in the above-quoted language, Tennessee courts have consistently found that an implied covenant of good faith and fair dealing applies to every contract. *Dick Broad. Co. v. Oak Ridge FM, Inc*., 395 S.W.3d 653, 661 (Tenn. 2013). However, Tennessee courts have also consistently found that a breach of the duty of good faith and fair dealing "is not a cause of action in and of itself but [is] a part of a breach of contract cause of action." *Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104, at *18 (E.D. Tenn. Mar. 31, 2011) (quoting *Lyons v. Farmers Ins. Exch*., 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000)); *see also Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003) ("Breach of the implied covenant of good faith and fair dealing is not an independent basis for relief."). As this Court has previously explained regarding the historically under-analyzed topic of how a breach of the implied covenant of good faith and fair dealing can be of significance even if it is not itself a cognizable cause of action:

> While the implied covenant does not create new contractual rights or obligations, it protects the parties' reasonable expectations as well as their rights to receive the benefits of their agreement. Thus, "there is an implied covenant of good faith and fair dealing in every contract, whereby neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." The general idea, at least in pertinent part, seems to be that one party cannot in bad faith get in the way of the counterparty's satisfaction of a contract condition that would result in the counterparty's realization of a benefit under the contract. In the Court's view, the following hypothetical demonstrates the principle. If a landowner agrees to pay a painter a $10,000

commission if she completes a "satisfactory" landscape of the landowner's estate, the landowner breaches the covenant of good faith and fair dealing—and thus the contract—if he stops allowing the painter onto his estate after the painter has completed most of the painting; the covenant protects the painter from the argument that she, not having "completed" a "satisfactory" landscape, is contractually not entitled to a commission.

*Walton v. Interstate Warehousing, Inc.*, No. 3:17-CV-1324, 2020 WL 1640440, at *9 (M.D. Tenn. Apr. 2, 2020) (citations omitted). The undersigned has further explained:

The general idea appears to be that if the defendant, through acts evidencing bad faith or unfair dealing (or at least the absence of good faith and fair dealing), prevents the occurrence of circumstances whereby the plaintiff would become entitled to receive from the defendant the contractual benefits for which the plaintiff bargained, the defendant must provide those benefits to the plaintiff despite the non-occurrence of those circumstances; if the defendant fails to do so, then the defendant is liable for breach. In such circumstances, therefore, showing breach of the implied covenant of good faith and fair dealing is a vital part of the defendant establishing the breach of contract even though breach of the implied covenant of good faith and fair dealing is not itself the actionable breach of contract.

*Evans v. Vanderbilt Univ. Sch. of Med.*, ---F. Supp. 3d---, 2022 WL 666971, at *19 (M.D. Tenn. Mar. 4, 2022). Here, even accepting DNP's version of the facts—*i.e.*, that Plaintiff demanded payment before it was due—DNP has not demonstrated that Plaintiff somehow "prevent[ed] the occurrence of circumstances whereby [DNP] would become entitled to receive from [Plaintiff] the contractual benefits for which [DNP] bargained." *Id.* What DNP bargained for was the hemp, and Plaintiff (allegedly) demanding payment prematurely (*after* the hemp was delivered to DNP, only to be rejected) did not prevent DNP from receiving the hemp. Accordingly, there is no breach of the covenant of good faith and fair dealing. And even assuming there was a breach, it was not a material one. If the breach of contract "was slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of his or her duty of performance, although he or she may recover damages for the breach." *DePasquale v. Chamberlain*, 282 S.W.3d 47, 53 (Tenn. Ct. App. 1997) (internal quotation marks omitted). DNP simply presents no argument or authority

supporting the proposition that Plaintiff's breach (assuming, contrary to the Court's conclusion above, that it was a breach) was a material one that excused DNP's obligation to pay under the Bill of Sale. (Doc. No. 152 at 7-9). Further, if the Court were to credit DNP's argument, that would result in every purchaser otherwise contractually obligated to pay for goods being relieved of that obligation if the seller merely requested payment before it was due. That result is untenable.

Accordingly, the Court rejects DNP's argument that DNP's breach of the Bill of Sale is excused.

### C. DNP Breach the Bill of Sale Because DNP Refused to Pay for the Hemp Because It Was (Allegedly) Non-Conforming.

Here, it is undisputed that Plaintiff and DNP entered into a contract for the sale and purchase of the hemp biomass at issue in this litigation. (Doc. No. 148 at ¶ 1). It is also undisputed that the Bill of Sale provided for DNP to purchase from Plaintiff the hemp biomass at issue in this litigation for a total purchase price of $400,000.00. (*Id*. at ¶¶ 2-3). It is further undisputed that the hemp at issue in this litigation was delivered by Plaintiff to 1253 Petty Road, as required by the Bill of Sale. (*Id*. at ¶ 9).[12] And it is undisputed that DNP did not make any payment to Plaintiff for the hemp. (*Id*. at ¶ 11). As discussed above, the Bill of Sale did not give DNP the right to reject the hemp for quality issues, and it is undisputed that DNP's proffered basis for its (attempted) rejection of the hemp was quality-related issues. (Doc. No. 151-3 at ¶¶ 20-21).

On Plaintiff's Motion for Summary Judgment on the Breach of Contract Claim, the Court must view facts and inferences in the light most favorable to DNP. *Westfield Ins. Co*., 336 F.3d at

---

[12] Here, DNP disputes this fact "in the sense that it is not known to DNP what was delivered to this address[.]" (Doc. No. 148 at ¶ 9). DNP attempts to manufacture a dispute of fact by claiming that they are unaware whether the hemp delivered was the hemp "at issue in this litigation." Nevertheless, Plaintiff supported his assertion of this fact—that the hemp was delivered—with competent evidence, namely with deposition of Spann, wherein he testified that the hemp was delivered to Petty Road. (Doc. No. 140-2 at 3-4). DNP does not cite evidence to contest this fact, nor do they seriously contest anywhere in this litigation that the hemp was delivered to DNP on that date.

506. In addition, "if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer*, 104 F.3d at 843 (citation omitted). Here, even viewing the facts in a light most favorable to DNP, the undisputed facts demonstrate that DNP breached the contract by failing to pay for the hemp. No reasonable juror could conclude otherwise and Plaintiff has supported his Motion with credible evidence. Accordingly, Plaintiff's Motion will be granted.

### *DNP's Motion*

On DNP's Motion for Summary Judgment on the Breach of Contract Claim, the Court must view the above facts most favorably to Plaintiff, the non-moving party. Doing so, the Court finds that a reasonable jury could find—even assuming, contrary to the Court's conclusion above, that it would not be *required* to find—that DNP breached the contract. Accordingly, DNP's Motion for Summary Judgment on the Breach of Contract Claim (Doc. No. 135) will be DENIED.

## II. Shawn Ridley's Individual Liability

Plaintiff filed an additional Motion for Summary Judgment (Doc. No. 138), asserting that the undisputed facts show that Plaintiff is entitled to summary judgment on his corporate veil-piercing claim. Plaintiff asserts that although Ridley is not directly liable under the Bill of Sale, the Court should pierce the corporate veil and hold Ridley individually liable for the debts of DNP. Plaintiff asserts this same argument in response to Ridley's Motion for Summary Judgment (Doc. No. 135), wherein Ridley argues that the undisputed facts show that he is not individually liable for any breach of contract because he was not a party to the contract. Accordingly, the Court will turn to the issue of corporate veil-piercing. The Court will first consider Plaintiff's Motion, and in so doing necessarily views the evidence, and draws reasonable inferences, in Ridley's favor.

*Plaintiff's Motion*

*A. Piercing the Corporate Veil*

When exercising diversity jurisdiction, the Court applies the choice-of-law principles of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Centra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008). Tennessee has long adhered to the "internal affairs" doctrine, under which matters involving the internal affairs of a foreign corporation are deemed substantive in nature and "should be resolved in accordance with the law of the state of incorporation." *Hicks ex rel. Union Pac. Corp. v. Lewis*, 148 S.W.3d 80, 84 (Tenn. Ct. App. 2003) (citing *Bayberry Assocs. v. Jones*, No. 87–261–II, 1988 WL 137181, at *4 (Tenn. Ct. App. Nov. 9, 1988)). Whether a court should pierce the corporate veil is a substantive determination, and DNP is a Kentucky LLC, so Kentucky law controls the veil piercing issue. The parties agree that Kentucky law applies.

The issue of whether to pierce the corporate veil under Kentucky law is an equitable determination for the court, and not one for the jury. *See Schultz v. Gen. Elec. Healthcare Fin. Servs. Inc.*, 360 S.W.3d 171, 174-75 (Ky. 2012). Kentucky courts have been clear that under Kentucky law, the piercing-the-corporate-veil doctrine applies to limited liability companies. *Turner v. Andrew*, 413 S.W.3d 272, 277 (Ky. 2013) (explaining that the piercing the corporate veil "doctrine can also apply to limited liability companies"); *see also Tayloe v. Sellco Two Corp.*, No. 2012-CA-001445-MR, 2014 WL 3674252, at *4 (Ky. App. Aug. 12, 2015) ("Kentucky law does not distinguish between corporations and LLCs when discussing liability or piercing the corporate veil."); *Pro Tanks Leasing v. Midwest Propane & Refined Fuels, LLC*, 988 F. Supp. 2d 772, 782-93 (W.D. Ky. 2013) (applying Kentucky law and analyzing whether the piercing the corporate veil

was warranted under the facts of that case). In other words, the notion of piercing the "corporate" veil includes piercing the limited-liability-company veil.

In Kentucky, there are traditionally two methods of piercing the corporate veil: the "alter ego" theory and the "instrumentality" theory.[13] *Bear, Inc. v. Smith*, 303 S.W.3d 137, 147 (Ky. Ct. App. 2010). However, the Supreme Court of Kentucky held that the tests for either theory are "essentially interchangeable." *Inter-Tel Techs., Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 165 (Ky. 2012). The court explained that, to pierce the corporate veil under either theory, a party must prove "two dispositive elements: (1) domination of the corporation resulting in a loss of corporate separateness and (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Id.*

1. Loss of Corporate Separateness

For the first element, a loss of corporate separateness, *i.e.*, domination, the Kentucky Supreme Court provided a list of factors for courts to consider:

a) Does the parent own all or most of stock of the subsidiary?
b) Do the parent and subsidiary corporations have common directors or officers?
c) Does the parent corporation finance the subsidiary?
d) Did the parent corporation subscribe to all of the capital stock of the subsidiary or otherwise cause its incorporation?
e) Does the subsidiary have grossly inadequate capital?
f) Does the parent pay the salaries and other expenses or losses of the subsidiary?
g) Does the subsidiary do no business except with the parent or does the subsidiary have no assets except those conveyed to it by the parent?
h) Is the subsidiary described by the parent (in papers or statements) as a department or division of the parent or is the business or financial responsibility of the subsidiary referred to as the parent corporation's own?
i) Does the parent use the property of the subsidiary as its own?
j) Do the directors or executives fail to act independently in the interest of the subsidiary, and do they instead take orders from the parent, and act in the parent's interest?
k) Are the formal legal requirements of the subsidiary not observed?

---

[13] In *Inter-Tel*, the Kentucky Supreme Court also mentioned a third theory of veil piercing, *i.e.,* the "equity formulation" theory. 360 S.W.3d at 161-62. The Court did not reject this theory as a method for piercing the corporate veil, but ultimately spoke in terms of only the other two theories being cognizable. *Id.* at 165.

*Id*. at 163–64.[14] While the Kentucky Supreme Court has made clear that a court should consider all eleven factors, the court also noted that the most critical factors are "grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature." *Arapahoe Res., LLC v. Pro. Land Res., LLC*, No. CIV. 15-10-ART, 2015 WL 4887321, at *3 (E.D. Ky. Aug. 17, 2015) (Thapar, J.) (quoting *Inter-Tel Techs., Inc*., 360 S.W.3d at 164). Not all factors are required for a court to find domination. *See Inter–Tel Techs., Inc.*, 360 S.W.3d at 166–68 (holding that veil piercing was appropriate when two of three critical factors were met).

"[A] court may pierce the corporate veil to hold shareholders or officers liable for the corporation's wrongdoing." *Arapahoe Res., LLC*, 2015 WL 4887321, at *3 (citing *Inter–Tel Techs., Inc*., 360 S.W.3d at 155); *see also Roscoe v. Angelucci Acoustical, Inc*., 512 S.W.3d 730, 739 (Ky. Ct. App. 2017) (affirming trial court's determination on summary judgment that the corporate veil should be pierced to hold the individual owner of a corporation personally liable).

---

[14] *Inter-Tels* mentions two different sets of eleven factors that courts may consider, and did not instruct as to which set of factors to use. *Inter-Tels Tech., Inc*., 360 S.W.3d at 163-64. It appears that courts following *Inter-Tels* simply choose a set of factors to use. This makes sense, as many of the factors overlap and cover the underlying concern, *i.e.*, whether the parent company dominates the subsidiary. The Court will use the above list of factors, because it is what the Kentucky Supreme Court described as "the most straightforward listing." *Id*. at 163. Nevertheless the Court will mention the other set of factors, and note that consideration of those factors also weighs in favor of piercing the corporate veil for the reasons mentioned herein. Those factors are:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Id*. at 163 (quoting *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008)). For the reasons stated in the Court's analysis throughout this opinion, the Court finds that eight factors weigh in favor of piercing the corporate veil, two factors do not apply (failure to issue stock and nonpayment of dividends), and one factor weighs in favor of not piercing the corporate veil (absence of corporate records). Accordingly, consideration of these additional factors bolsters the Court's conclusion that the corporate veil of DNP should be pierced.

It is important to step back to see how this principle applies in this case. In the case of an LLC, this principle needs to be modified to refer to holding liable *members* (the term for the owners of an LLC), rather than *shareholders* (the term for the owners of a corporation). Here, Plaintiff seeks to hold Ridley liable, but Ridley is not a member of DNP; true, he is the sole member of the sole member of DNP (*i.e.*, Dutch Naturals Processing, LLC), but that is something different (especially where, as here, Plaintiff does not make an argument in favor of "double-piercing"). So how does this principle apply in this case? As applicable here, the operative principle is that a court may (under certain circumstances) pierce the LLC veil to hold officers liable for the LLC's wrongdoing; thus, it may potentially hold Defendant Ridley, the sole manager of DNP, liable for DNP's wrongdoing. And to determine whether to do so, the court consults the above-mentioned factors, cognizant that although they are phrased in terms of a situation involving potentially piercing a subsidiary corporation's veil to reach a parent corporation, the instant case involves breaching an *LLC*'s veil to reach an *individual*. The Court will below recant the factors *verbatim* per the above quotation but will gear the analysis of each factor to the potential piercing of an LLC (the "subsidiary" for purposes of the factors) to reach an individual (the "parent" for purposes of the factors).

> *Does the parent own all or most of the stock of the subsidiary?* On its face, this factor does not apply because is no "stock" issued by DNP, because it is an LLC and not a corporation. However, when viewing the ownership interest(s) in DNP, which is how this factor (concerning "stock") can be applied in the context of an LLC, DNP is a wholly-owned by Dutch Naturals, LLC,

not Ridley.[15] (Doc. No. 150 at ¶¶ 5 and 11). Thus, this factor does not weigh in favor of a finding of domination.

*Do the parent and subsidiary corporations have common directors or officers*? This factor is simply inapplicable where, as here, the "parent" is an individual and therefore has no directors or officers. It is not lost on the undersigned that the "parent" is the sole officer (manager and, as noted below, "CEO") of the "subsidiary," but this significant fact is addressed via other factors and is patently inapplicable to this factor as it is expressly stated. Thus, this factor weighs in favor of neither side.

*Does the parent corporation finance the subsidiary*? Plaintiff explains that:

> DNP was entirely dependent on monies from Ridley and Dutch Naturals, LLC to pay its debts, including its obligation to pay for the hemp under the Bill of Sale. DNP did not have a bank account or line of credit. SUMF 32. Instead, Ridley paid DNP's financial obligations, such as payroll for its independent contractors, using transfers from a personal checking account at Whitaker Bank in the name of he and his girlfriend (which they used for personal expenses) to a WesBanco account that he controlled in the name of Dutch Naturals, LLC. SUMF 19-20, 22-23, 25).

(Doc. No. 138 at 10). Ridley does not dispute these facts. (See Doc. No. 150 at ¶¶ 19-20, 22-23, 25, 31). He does dispute that he was directly paying DNP's debts from his personal checking, asserting that he was instead transferring funds from his personal checking to Dutch Naturals, LLC's account to pay DNP's debts. (Doc. No. 150 at ¶ 25). But Ridley does not explain how this makes a difference, considering that he also had sole control over Dutch Natural's funds, as he admits when he states, "[a]s Mr. Ridley explained in his second deposition, he was the source of all funds for Dutch Naturals and DNP." (*Id*. at ¶ 26; *see also id*. at ¶ 11 (listing as undisputed that "Dutch Naturals, LLC is controlled by Shawn Ridley", *id*. at ¶ 43 (listing as undisputed that "Dutch

---

[15] Of course, Plaintiff conceivably could answer that DNP is "not really" owned Dutch Naturals, LLC but rather actually is owned by Ridley using the pretense that it is owned by Dutch Naturals. But the Court does not perceive that this argument has been developed such that the Court can disregard, for purposes of applying the relevant factors, the agreed fact that DNP is owned *by Dutch Naturals, LLC*

Naturals, LLC is controlled by Shawn Ridley, either individually or through entities that he solely controls")). Accordingly, this factor weighs in favor of a finding of domination.

*Did the parent corporation subscribe to all of the capital stock of the subsidiary or otherwise cause its incorporation*? When looking at the ownership interest(s) in DNP (which is what this factor implicates when the "subsidiary" is an LLC rather than a corporation), it cannot be said that the "parent" (Ridley) subscribed to all of the ownership interest in DNP, which is wholly-owned by Dutch Naturals, LLC.[16] But this factor still cuts against Ridley, because he caused DNP's formation by forming both Dutch Naturals, LLC and its subsidiary DNP just over a month prior to executing the Bill of Sale, in October 2019, appointing himself CEO of both companies. (Doc. No. 150 at ¶¶ 1-2, 8-10). (As noted above, he also made himself the sole manager for each of these LLCs.) Accordingly, this factor supports a finding of domination.

*Does the subsidiary have grossly inadequate capitalization*? Ridley does not dispute that DNP has no bank accounts or lines of credit and has realized less than $5,000 in revenue since its inception. (*Id*. at ¶¶ 32, 33). Thus, like the corporation in *Inter-Tel*, DNP was "grossly inadequate capital for day-to-day operations because it had no funds at all, literally nothing of its own." *Inter-Tel Techs., Inc.*, 360 S.W.3d at 167. And although it is undisputed that DNP purchased equipment in the amount of approximately $100,000 in 2020, (Doc. No. 150 at ¶ 35), the court in *Inter-Tel* explained that the "consideration of the adequacy of capitalization concerns the initial financing of the corporation, not its condition at the time of the events complained of or thereafter." *Inter-Tel Techs., Inc.*, 360 S.W.3d at 167 (citation omitted). Ridley also admits in his response to Plaintiff's Statement of Undisputed Facts that he was the source of all funds for Dutch Naturals

---

[16] True, Dutch Naturals, LLC is wholly-owned by Ridley—a fact that indirectly cuts against Ridley on other factors—but neither the factor itself nor Plaintiff suggests that this means that Ridley should be treated as subscribing to all of the ownership interests of DNP for purposes of this factor.

and DNP including funds he routed through Ridley Capital [another corporation owned solely by Ridley] or directly to Dutch Naturals." (Doc. No. 150 at ¶ 26). The Kentucky Court of Appeals recently held that a similar situation where the LLC was never "adequately capitalized" and it was supported by "consistent payments from the personal account" of the defendant "support[ed] the conclusion that [the LLC] was not properly capitalized to operate as an entity separate from [the defendant]." *SPA Rentals, LLC v. Somerset-Pulaski Cnty. Airport Bd.*, No. 2021-CA-0117-MR, 2022 WL 3007471, at *1 (Ky. Ct. App. July 29, 2022). Accordingly, this factor weighs in favor of a finding of domination.

*Does the parent pay the salaries and other expenses or losses of the subsidiary*? As explained above, it is undisputed that Ridley (the "parent") pays for the expenses of DNP by transferring funds from his personal checking to Dutch Naturals, LLC's (an entity which he also solely controls) account to pay DNP's debts. (Doc. No. 150 at ¶ 25). Accordingly, this factor weighs in favor of a finding of domination.

*Does the subsidiary do no business except with the parent or does the subsidiary have no assets except those conveyed to it by the parent?* DNP (the "subsidiary") undisputedly does business with others—most notably Plaintiff and with the seller of the below-referenced equipment—and not only with Ridley (the "parent") . As to the second portion of this factor, as mentioned above, it is undisputed that DNP purchased equipment in 2020 in the amount of approximately $100,000 (Doc. No. 150 at ¶ 35). Thus, because DNP does business with others and does have some of its own assets (albeit purchased perhaps solely with Ridley's money), and the Court will view the facts most favorable to Defendant on Plaintiff's Motion, the Court will find that this factor weighs in favor of not piercing the corporate veil.

*Is the subsidiary described by the parent (in papers or statements) as a department or division of the parent or is the business or financial responsibility of the subsidiary referred to as the parent corporation's own?* It is undisputed that Ridley (the "parent") referred to the monies that DNP (the "subsidiary") intended to use to pay for Plaintiff's hemp as "my money," (Doc. No. 151-12 at 5), testified that he originally transferred $250,000 for the down-payment "if *I* decided to accept the hemp," (Doc. No. 139-11 at 12), and texted the Plaintiff after signing the Bill of Sale that "[] *I* took that crap off your hands…," referring to the hemp biomass (Doc. No. 150 at ¶ 31). Accordingly, it is apparent from this evidence, even when viewed in Ridley's favor, that Ridley treated the financial responsibility of DNP as his own. And, as noted extensively above, it is undisputed that Ridley paid for DNP's debts through transfers to Dutch Naturals from his personal bank account. Accordingly, this factor weighs in favor of a finding of domination.

*Does the parent use the property of the subsidiary as its own?* It is undisputed that DNP does not have any bank accounts or lines of credit (Doc. No. 150 at ¶ 32); thus there is nothing available for Ridley to treat as his own. DNP does own $100,000 in equipment however, and it is unclear from the record how this equipment is treated by Ridley. Thus, viewing the facts in Ridley's favor, the Court will find out of an abundance of caution that this factor weighs in favor of not piercing the corporate veil.

*Do the directors or executives fail to act independently in the interest of the subsidiary, and do they instead take orders from the parent, and act in the parent's interest?* It is undisputed that Ridley is the sole manager of DNP. *See Dutch Naturals Processing, LLC*, Kentucky Secretary of State, https://web.sos.ky.gov/ftshow/(S(co13i4gbysxu5yceiomiffdk))/default.aspx?path=ftsearch&id=1074457&ct=06&cs=99999&ce=Tpy%2buMN0NAXeYCAR1eQAlmxxeofH7GOeMeUBbdEPQuzJSsv%2fZwqdtoHChOVT6j2p.  He is also CEO of both DNP and Dutch

Naturals, LLC. (Doc. No. 150 at ¶¶ 2, 10). DNP does not have other members, directors, or executives (Doc. No. 150 at ¶ 3), with Ridley being the only person controlling DNP and the only person to represent DNP's interest. (Doc. No. 150 at ¶ 39); *see also Arapahoe Res., LLC*, 2015 WL 4887321, at *3 (explaining that this factor weighed in favor of piercing the corporate veil where there are no other employees to represent the corporation's interest). Ridley admits that DNP is controlled by him and that he has "exclusive management authority over DNP." (*Id.* at ¶¶ 5, 42). And Ridley naturally is properly perceived to "take orders" from himself. Thus, this factor weighs in favor of a finding of domination.

*Are the formal legal requirements of the subsidiary not observed?* As Ridley points out, per Kentucky law, limited liability companies are not required to have board meetings or keep minutes. (*Id.* at ¶ 4). However, they are required to file annual reports, which DNP has appeared to have done. *See* Dutch Naturals Processing, LLC, Kentucky Secretary of State, https://web.sos.ky.gov/ftshow/(S(co13i4gbysxu5yceiomiffdk))/default.aspx?path=ftsearch&id =1074457&ct=06&cs=99999&ce=Tpy%2buMN0NAXeYCAR1eQAlmxxeofH7GOeMeUBbdE PQuzJSsv%2fZwqdtoHChOVT6j2p. On the other hand, Kentucky law does require that managers of an LLC to respect the distinction between an LLC and its managers, and (as discussed above) Ridley has failed to respect these formalities. On balance, and construing things in favor of Ridley, the Court finds that this factor weighs in favor of neither party.

*Most Critical Factor #1—Grossly Inadequate Capitalization:* Above, the Court considered this factor and found DNP to have grossly inadequate capitalization. *See Inter–Tel*, 360 S.W.3d at 167 ("ITS had grossly inadequate capital for day-to-day operations because it had no funds at all, literally nothing of its own."). Accordingly, this factor weighs in favor of a finding of domination.

*Most Critical Factor #2—Egregious Failure to Observe Legal Formalities and Disregard Distinctions Between Parent and Subsidiary:* As noted above, as a Kentucky limited liability company, per Kentucky law DNP does not have to observe certain formalities as a corporation would. On the other hand, under Kentucky law, the distinction between an LLC and its Owner(s) does not to be observed, and the Court finds that there has been an egregious disregard of the distinction between Ridley and DNP. As mentioned almost *ad nauseum* at this point, it is undisputed that all debts and expenses of DNP are paid through funds from Ridley's personal account that are transferred to Dutch Naturals. DNP has no bank accounts or lines of credits of its own, depending fully on these such transfers to pay its debts and expenses. Accordingly, even viewing the facts in favor of Ridley, there is an egregious disregard of distinctions between Ridley and DNP. Accordingly, this factor weighs in favor of a finding of domination.

*Most Critical Factor #3—High Degree of Control:*

Ridley admits that "exclusive management of DNP is vested in Ridley," he is the "sole manager" answerable only to himself. (Doc. No. 150 at ¶¶ 3, 39). He also admits that "he is the person in control of the bookkeeping as well as the finances for DNP." (*Id*. at ¶ 6). Additionally, DNP has no other employees to represent its interests outside of Ridley's interests. (*Id*. at ¶ 34 (Ridley lists as not disputed the fact that "[t]here are no current or former [ ] business partners or employees, laboratory personnel or loan officers of DNP."). Accordingly, as the only person making decisions for DNP, he exercises a high degree of control over DNP and its day-to-day operations, and this factor weighs in favor of a finding of domination. That is not to say that there is anything inherently improper about Ridley acting as the sole manager of DNP, which is precisely what DNP's bylaws call for. But it is to say that where (as here) there is only a single manager of the LLC, it is obviously more likely that the single manager dominates the LLC.

*Conclusion*

Here, six of the eleven factors weigh in favor of piercing the corporate veil, three weigh in favor of not doing so, and two do not weigh in favor of either side. Furthermore, all three of the "most critical factors" weigh in favor of piercing the corporate veil. *Inter-Tel Techs., Inc.*, 360 S.W.3d at 164. Thus, even when viewing the facts in a light most favorable to Ridley, the Court finds that Plaintiff has established the undisputed facts (which are supported by competent evidence as required to grant a plaintiff's motion for summary judgment) support that Plaintiff has satisfied the first element of his veil-piercing claim.

2. Sanction Fraud or Promote an Injustice

To obtain summary judgment on his veil-piercing claim, Plaintiff also must demonstrate the second element: that "the circumstances under which continued recognition of the [LLC] would sanction fraud or promote injustice." *Inter-Tel Techs., Inc.*, 360 S.W.3d at 165.

"[T]he trial court should state specifically the fraud or injustice that would be sanctioned if the court declined to pierce the corporate veil." *Id.* at 165. Although evidence of actual fraud is not required to meet this element, "the injustice must be something beyond the mere inability to collect a debt from the corporation." *Id.* The Kentucky Supreme Court has identified examples of unjust situations where courts have properly pierced the corporate veil. *Id.* at 164. Such instances may arise when a parent corporation causes a subsidiary's liability and then renders the subsidiary unable to pay the liability; or when "an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful." *Id.* at 167–68 (citing *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 522–24 (7th Cir. 1991)).

Plaintiff argues that Ridley's actions promoted an injustice. Plaintiff asserts that it is undisputed that Ridley obligated DNP to incur a $400,000 obligation for the purchase of hemp

under the Bill of Sale, and then deprived DNP of the means to cover this liability after his actions caused DNP to breach the contract. Plaintiff contends that this promotes an injustice because:

> Ridley's actions in obligating DNP to pay for the hemp biomass under the Bill of Sale, funding the down-payment, and then repudiating the contract and clawing these monies back for his personal use represents the quintessential abuse of the corporate form which justifies veil piercing. By distributing monies earmarked for the purchase of the hemp to himself when DNP's assets were far less than its total liability under the Bill of Sale, thus rendering it unable to pay this debt in the regular course of business, Ridley blatantly deprived DNP of the ability to satisfy its $400,000 obligation and perpetrated an injustice upon DNP and its creditor, the Plaintiff. Equity demands that Ridley should be held to account, and piercing DNP's corporate veil as to Defendant Ridley is amply justified under these circumstances.

(Doc. No. 138 at 14).

Indeed, Defendant concedes that the following facts are undisputed: Ridley signed the Bill of Sale in his capacity as CEO of DNP, (Doc. No. 150 at ¶ 48); "Shawn Ridley transferred the $250,000 from his line of credit to his personal bank account in the event he decided to accept the hemp," (*id*. at ¶ 49); "[o]n or about January 23, 2020, Mr. Ridley, as CEO of DNP, decided that the hemp provided by the Plaintiff was not acceptable for the use intended by DNP" (*id*. at ¶ 50); "[o]n or about January 24, 2020, Ridley rejected the hemp provided by the Plaintiff," (*id*. at ¶ 51); "[o]n January 28, 2020, Shawn Ridley sent an email directing that $250,000 of the money transferred to his personal bank account 'were not needed at this time,' and that they be transferred back to his line of credit," (*id*. at ¶ 52); "[o]n January 29, 2020, the $250,000 was transferred back to Shawn Ridley's line of credit," (*id*. at ¶ 53); and DNP itself has no bank accounts or lines of credit to enable it to pay its debt on the Bill of Sale (*id*. at ¶ 32).

Nevertheless, Ridley contends that the above actions do not promote an injustice because Ridley

> provide[d] personal funds as an investor to Dutch Naturals. Such a practice is not evidence of comingling anything inappropriate. It is an investor providing funds for

companies in which he has a vested interest. DNP did not have the money and he as in investor did. That is what investors do, they put personal money into entity ventures.

(*Id*. at ¶ 25).

The Court disagrees with Ridley's assertion that he is acting as a mere investor of DNP. As Ridley does not dispute in this litigation and as detailed above, he has sole control over the activities of DNP. That control has enabled Ridley both to incur debts on behalf of DNP and render DNP unable to pay those debts—which, as discussed below, promotes an injustice that warrants corporate veil piercing.

In *Kentucky Petroleum Operating Ltd. v. Golden*, 921 Energy, LLC and Macar Investments, LLC (collectively "the Macar parties"), sold oil and gas leases to entities controlled by Mehran Ehsan—KPO, LLC, and KPO, Ltd. (collectively "the KPO debtors"). No. CIV. 12-164-ART, 2015 WL 927358, at *1 (E.D. Ky. Mar. 4, 2015) (Thapar, J.) A dispute arose over whether the KPO debtors satisfied their obligations under those sales contracts and whether the Macar parties delivered all of the promised leaseholds. *Id*. The parties entered arbitration, which resulted in the arbitrator awarding to Macar Investments a lump sum of $466,187. *Id*. Prior to the arbitrator entering his final award, "the KPO debtors executed a mortgage and UCC–1 financing statement that gave a related company, Kentucky Petroleum Limited Partnership ("KPLP"), another entity controlled by Ehsan, a security interest in all of the leases they bought from the Macar parties." *Id*. "The KPO debtors also transferred to KPLP all of their rights and revenue from the leases." *Id*. The result was that when the arbitrator issued his final award, the KPO debtors had no assets with which to pay the Macar parties. *Id*.

Judge Thapar, then sitting on the district court, explained that under *Inter–Tel*, an example of an injustice warranting veil piercing is where "a parent corporation or director caus[es] a

subsidiary's liability and then render[s] the subsidiary unable to pay that liability." No. CIV. 12-164-ART, 2015 WL 927358, at *8 (E.D. Ky. Mar. 4, 2015) (Thapar, J.) (citing *Inter–Tel*, 360 S.W.3d at 168–69). Noting this, Judge Thapar held that Ehsan—who "control[led] and direct[ed]" the KPO debtors, incurred liability on behalf of the KPO debtors, and then "rendered the KPO debtors unable to meet their obligations"—promoted an injustice, thus warranting the piercing of the corporate veil of KPLP. *Id*. Judge Thapar explained that "[o]n these facts, the continued recognition of the KPO debtors and KPLP's supposedly 'separate' corporate form[] would sanction injustice." *Id*.

The defendants in *Kentucky Petroleum Operating Ltd.* asked Judge Thapar to reconsider his decision, arguing that it was merely "good business sense" to strip the KPO debtors of their assets. *Kentucky Petroleum Operating Ltd. v. Golden*, No. CIV. 12-164-ART, 2015 WL 2153344, at *4 (E.D. Ky. May 7, 2015) (ruling on the defendant's motion to reconsider). Judge Thapar held that despite the defendant's

> "good business sense" spin on the transaction, . . . the result is the same: A director (Ehsan) caused the subsidiaries' liability (the KPO debtors' obligations to the Macar parties), and then rendered the subsidiaries unable to pay that liability. The corporate form is not meant to protect this kind of injustice.

*Id*.

The facts of *Kentucky Petroleum Operating Ltd.* are similar to the undisputed facts here: Ridley caused DNP's liabilities by entering into the Bill of Sale where he agreed to pay $400,000 to Plaintiff. He then rendered DNP (a company that undisputedly has no bank accounts or lines of credit) unable to pay under the Bill of Sale by rejecting the hemp and transferring the funds he planned to use to pay for the hemp back to his line of credit. (Doc. No. 150 at ¶¶ 132, 148-153). By incurring liabilities on behalf of the LLC that he controlled, and rendering the LLC unable to

pay to liabilities, Ridley promoted an injustice "that the corporate form is not meant to protect." *Kentucky Petroleum Operating Ltd.*, 2015 WL 2153344, at *4.

*Kentucky Petroleum Operating Ltd.* is distinguishable in the sense that DNP never was capitalized to begin with, so that Ridley was not affirmatively *stripping* DNP of assets to avoid liabilities. But this hardly makes him less culpable; in fact, by failing to capitalize DNP in the first place, he was culpable from the outset. The Kentucky Court of Appeals recently pierced the corporate veil of an LLC to hold the sole-member personally liable under a similar scenario. *SPA Rentals, LLC*, 2022 WL 3007471, at *1. In *Spa Rentals, LLC*, the court explained that respecting the corporate form of the LLC under such circumstances "would allow the member to pick and choose which obligations to satisfy without consequence." *Id*. at *6. The court explained that "if the member could not be held personally responsible for the entity's debts, then any debt the member chose not to pay would be unrecoverable. Such is unjust." *Id*. Likewise, here, allowing Ridley to pick and choose which debts of DNP he chose to pay off, while cloaking him in the protection of the corporate form, would be unjust.[17]

Even viewing the undisputed facts (which are supported by competent evidence as required to grant a plaintiff's motion for summary judgment) in Ridley's favor, the Court finds that Ridley's actions promote an injustice that satisfies the second element required to pierce the corporate veil as laid out in *Inter-Tels*. Here, the injustice is "something beyond the mere inability to collect a debt from the corporation." *Id*. Ridley incurred obligations on behalf of DNP yet did not supply DNP with the necessary funds (either through transfers from his personal bank account or from

---

[17] In Ridley's response to Plaintiff's Statement of Undisputed Facts, he disputes that Ridley was "personally paying DNP's debts" from his checking account. (Doc. No. 150 at 7). He disputes this because he states that his plan was to deposit funds from his personal account to Dutch Naturals, LLC, the parent company of DNP, to then pay for DNP's debts. It is undisputed, however, that Ridley also has sole control Dutch Naturals, LLC (Doc. No. 150 at ¶ 11), and, in any event, Ridley does not explain how this makes any difference or somehow absolves him of the ability to do the very thing the Court finds unjust—the ability to simply choose not to pay a debt by not funding DNP (rather through Dutch Natural's account, or his own account) and remain shielded from liability.

Dutch Naturals, LLC) to pay those obligations unless he chose to do so, thereby allowing him to pick and choose which debts to pay while invoking the corporate form to shield him from personal liability for the debts he chose not to pay. As the Kentucky Court of Appeals explained, "[s]uch is unjust." *SPA Rentals, LLC*, 2022 WL 3007471, at *4. This type of situation specifically tracks one of the examples offered by the Kentucky Supreme Court as to when a situation will promote an injustice: where "a parent corporation causes a subsidiary's liability and then renders the subsidiary unable to pay the liability." *Inter-Tel Techs., Inc.*, 360 S.W.3d at 165. Accordingly, the second element is satisfied.

### 3. The Court Will Pierce the Corporate Veil

As discussed above, the Court finds that even viewing the undisputed facts (which are supported by competent evidence that would entitle Plaintiff to a directed verdict, which is required to grant a plaintiff's motion for summary judgment, *Timmer*, 104 F.3d at 843), in favor of Ridley, the non-moving party on Plaintiff's Motion, both elements of corporate veil piercing are satisfied. It is axiomatic that the legal significance of piercing the corporate veil is to make someone (or something) else liable for a corporation's (or in this case, an LLC's) liabilities. *Piercing the Corporate Veil*, Black's Law Dictionary (10th ed. 2014). As the Kentucky Supreme Court has described it, when veil-piercing applies, "the debt of the pierced entity becomes enforceable against those who have exercised dominion over the [entity] to the point that it has no real separate existence." *Inter-Tel Techs., Inc.*, 360 S.W.3d at 155 (Ky. 2012). In the present case, there is no genuine issue of material fact as to whether Ridley is someone who has exercised dominion over DNP to the point that it has no separate existence; based on facts not genuinely in dispute, the Court concludes that it is able to determine (as a matter of law) that Ridley is such a person and therefore is personally liable for DNP's debt to Plaintiff under the veil-piercing doctrine.

Accordingly, a bench trial is not necessary to determine Ridley's personal liability on the contract. Plaintiff's Motion for Summary Judgment on his Veil Piercing Claim will be granted.

*Defendant's Motion*

On the other side of the coin, it goes without saying that when viewing the undisputed facts in a light most favorable to Plaintiff, Defendant has not shown that a reasonable juror could find that the corporate veil should not be pierced. Accordingly, he cannot demonstrate that a reasonable juror would find that he is not individually liable on the contract. Accordingly, his Motion (Doc. No. 135) asking the Court to find that he is not individually liable for DNP's breach of contract will be DENIED.

CONCLUSION

For the above-mentioned reasons, Plaintiff's Motion for Summary Judgment on Breach of Contract Claim (Doc. No. 140) will be GRANTED; Plaintiff's Motion for Summary Judgment on his Veil Piercing Claim as to Individual Defendant Shawn Ridley (Doc. No. 137) will be GRANTED; Defendant Dutch Naturals Processing, LLC's Motion for Summary Judgment (Doc. No. 134) will be DENIED; and Defendant Shawn Ridley's Motion for Summary Judgment (Doc. No. 135) will be DENIED.

Accordingly, summary judgment will be entered in favor of Plaintiff on its breach-of-contract claim, and its veil-piercing claim.

An appropriate order will be entered wherein the Court will instruct the parties to file briefing regarding the damages to be awarded.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE